UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

FAR EAST CONSTRUCTION COMPANY, HYUN B. KANG, and KYONG S. KANG,

Defendants.

No. 18 C 7069

**COMPLAINT OF THE UNITED STATES**

The United States of America, by John R. Lausch, Jr., United States Attorney for the Northern District of Illinois, for its complaint alleges as follows:

**Introduction**

1. This is an action for damages and civil penalties arising from false claims presented or caused to be presented by defendants Far East Construction Company ("Far East"), Hyun B. Kang, and Kyong S. Kang to the United States in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729-33.

2. The claims in this case arise from defendants' role in causing the Department of the Army, the United States Coast Guard and the General Services Administration ("GSA") to award approximately $4 million in contracts that were set aside for performance by firms eligible for the Business Development Program authorized by section 8(a) of the Small Business Act and 13 C.F.R. Part 124 (the "8(a) Program" and Historically Underutilized Business Zone program authorized by 15 U.S.C. § 657a (the "HUBZone Program")—both administered by the Small Business Administration ("SBA")—to Far East. Defendants Hyun Kang and Kyong Kang were owners, officers, and agents of Far East.

3. As described more fully below, from 2012 to 2013[1] the defendants submitted, caused to be submitted, or conspired to submit or cause to be submitted, false claims or false statements material to claims in order to obtain or promote the award of federal SBA 8(a) and/or HUBZone contracts from the United States to Far East. In connection with the award of these contracts, the defendants certified or caused certifications or statements to be made that Far East met all requirements to qualify for SBA's 8(a) and/or HUBZone programs with knowledge or reckless disregard for the truth of the matter that Far East did not, in fact, meet such requirements and was not entitled to the award of such contracts.

4. By diverting contracts and benefits therefrom intended for 8(a) and/or HUBZone-eligible firms towards an ineligible company, defendants undercut the purpose of statutorily created programs to encourage contract awards to legitimate 8(a) and HUBZone firms. The United States did not receive the intended benefits of an 8(a) and/or HUBZone firm receiving and performing the federal contracts. These wrongful actions further induced or resulted in the government's inappropriate award of these contracts and payment of millions of dollars on these federal contracts. Defendants, therefore, are liable to the United States under the FCA for treble damages and civil penalties as permitted by law.

5. Additionally, through these actions, the defendant intended to defraud the government through the submission of these material misrepresentations, the government reasonably relied upon these representations, and the government suffered damage as a result of such reliance in making payments to an ineligible contractor and through the diversion of

[1] Defendants submitted, caused to submitted, or conspired to submit or cause to be submitted, false claims or false statements material to claims starting in 2008, totaling over $70 million in payments. However, the government is limited to recovery of funds that have occurred within 6 years of the filing of this suit. 31 U.S.C. § 3731(b)(1).

contractual opportunities and the acquisition of profits that were intended for legitimate 8(a) and/or HUBZone firms. As a result, defendants are responsible for common law fraud and are liable to the government for damages.

6. Further, as a result of defendants' misrepresentations and fraudulent conduct, defendants were unjustly enriched at the government's expense, and equity and good conscience militate against permitting defendants to retain this enrichment. Defendants, therefore, are liable to the government for all monies unjustly earned.

**Jurisdiction and Venue**

7. This court has jurisdiction over this False Claims Act complaint pursuant to 28 U.S.C. § 1345 and 31 U.S.C. § 3730(a).

8. Venue is proper in the Northern District of Illinois under 31 U.S.C. § 3732 and 28 U.S.C. §1391(b) because one or more defendants reside in this district, all defendants reside in the State of Illinois, and the acts proscribed by 31 U.S.C. § 3729 occurred in this district.

**Parties**

9. Plaintiff is the United States, suing on behalf of the General Services Administration, United States Coast Guard, the United States Army, and the Small Business Administration. The Coast Guard and Army are branches of the United States Armed Forces.

10. Defendant Far East Construction Company is an Illinois corporation licensed to do business, and is conducting business, in the State of Illinois.

11. Defendant Hyun B. Kang, president, chief executive officer, and owner of Far East, is a domiciliary of Illinois.

12. Defendant Kyong Suk Kang, agent of Far East, is a domiciliary of Illinois. Kyong Kang assisted Hyun Kang in the control of daily operations and management of Far East.

13. In doing the acts described in the paragraphs below, defendants Hyun and Kyong Kang, at all relevant times, acted as agents of Far East.

14. Prior to the filing of this lawsuit, the United States notified Far East, Hyun Kang and Kyong Kang of potential civil claims under the FCA and other federal statutes and regulations, equity or the common law relating to the alleged false statements made regarding federal contracts awarded to Far East from 2008 until 2013.

## Factual Allegations

### I. Statutory and Regulatory Requirements for SBA 8(a) and HUBZone Program Contracts

15. The 8(a) Program is administered by the Small Business Administration, a department and agency of the United States. The program is named for Section 8(a) of the Small Business Act and is a development program that was created to help small, disadvantaged businesses compete in the American economy and access the federal procurement market. To qualify for the 8(a) Program, a business (commonly referred to by the SBA and other government agencies as the "firm") must be at least 51% owned and controlled by a U.S. citizen (or citizens) of good character who meet the SBA's definition of socially and economically disadvantaged. The firm must also be a small business (as defined by the SBA) and a show a reasonable potential for success.

16. The SBA's 8(a) Program exists, among other reasons, to facilitate the economic development of competitive small businesses that contribute to the overall health of the U.S. economy. The SBA's 8(a) Program furthers the additional goal of developing competitive small businesses owned by historically disadvantaged socioeconomic groups. The U.S. government agencies that award 8(a) contracts further these goals by, among other things, awarding contracts either on a set-aside basis, where the only competitive bidding is among similarly eligible firms,

or on a sole-source basis, without competitive bidding. In doing so, those agencies further the congressional intent of the 8(a) Program by ensuring that 8(a) firms (and not other, ineligible firms) receive the benefit of the profits from the awarded contracts and the benefit of performing the volume of business from these contracts.

17. As a prerequisite to participation in the 8(a) Program and to further payment under any government contracts subsequently awarded through that program, a firm must apply and qualify for participation in the 8(a) Program through a formal, SBA-administered application process. SBA regulations require firms to inform the SBA of any changes that would adversely affect program eligibility while they are participating in the program. The SBA may also terminate a firm from the 8(a) Program for good cause, such as submission of false information or failure to maintain eligibility requirements.

18. Participants in the 8(a) Program are subject to regulatory and contractual limits on subcontracting work from 8(a) set-aside contracts. The SBA regulations require, among other things, the 8(a) firm to agree that, on construction contracts, it "will perform at least 15 percent of the cost of the contract with its own employees (not including the cost of materials)." 13 C.F.R. § 125.6(a)(3). Likewise, the Federal Acquisition Regulation ("FAR") requires that all contracting officers for the government include a clause in 8(a) set-aside contracts that recites the application restriction on subcontracting. 48 C.F.R. § 19.811-3. The limitation on subcontracting is both a regulatory and contractual requirement to receive the benefits of the 8(a) Program.

19. The SBA also administers the HUBZone Program. To qualify for the HUBZone Program, a company must establish that: (i) it is a small business; (ii) it maintains a principal office located within an area that has been designated as a HUBZone; and (iii) at least 35% of its employees reside within designated HUBZone areas. 13 C.F.R. Part 126.

20. A company that applies for, and is granted, HUBZone status by the SBA qualifies to receive federal government contracts that are set aside for certified HUBZone firms. A HUBZone-certified firm is obligated to immediately inform the SBA of any material changes in its status. Such changes would include a change in ownership, a change in primary business address, a change in business structure, or a change in the company's compliance with the 35% residency requirement. As with the 8(a) Program, at least 15 percent of the cost of contract performance for construction contracts to be incurred for personnel must be spent on the HUBZone prime contractor's employees.

## II. The Fraudulent Scheme

21. The defendants violated the FCA by submitting, causing to be submitted, or conspiring to submit or cause to be submitted, false claims and false statements material to false claims in connection with the award of 8(a) and HUBZone contracts to Far East by GSA, the Coast Guard, and the Army either as a sole-source award intended for eligible 8(a) and HUBZone firms or through competitions that were intended to be limited to eligible 8(a) and HUBZone firms. Defendants did so with knowledge that Far East would not meet the requirements to be an 8(a) and HUBZone firm. More specifically, Far East would not meet the performance requirements set for 8(a) and HUBZone firms. The actions also constituted common law fraud and resulted in defendants' unjust enrichment.

22. Far East purported to specialize in, among other things, design/build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry. At all relevant times, Far East was certified to participate in the 8(a) and HUBZone Programs and was headquartered in Illinois.

23. MCC Construction Company ("MCC") was a construction management company

and a general contractor that provided design/build, renovation/restoration, and new construction services. At all relevant times, MCC's home office was located in Greenwood Village Colorado, with regional offices in different parts of the country. At all times relevant, MCC was not certified to participate in the 8(a) and HUBZone Programs.

24. Hyun Kang, Kyong Kang, Far East, MCC, and others engaged in and executed a scheme from, at least, January 2008, through approximately August 2013, to defraud a number of government agencies, including GSA, Coast Guard, and Army.

25. Defendants and MCC engaged in and executed their scheme by, among other things:

i. operating Far East as an entity with titled owners over whom MCC exerted impermissible control;

ii. concealing that MCC, which was not eligible for 8(a) or HUBZone contracting preferences, exercised impermissible control over Far East;

iii. causing misrepresentations that Far East was in compliance with SBA regulations pertaining to Far East's contracts, including that Far East employees had performed the required percentage of work on those contracts;

iv. engaging in deceptive practices to make it appear that MCC employees were actually employees of Far East; and

v. obtaining at least $70 million in U.S. government contracts as a result of false and misleading conduct.

**A. Impermissible Teaming Agreement**

26. In February 2008, Hyun Kang, acting on behalf of Far East, signed a teaming agreement with MCC related to the first of the approximately $70 million worth of contracts obtained through this scheme.

27. According to the terms of the agreement, Far East was responsible for contract delivery efforts, and there were supposed to be clear delineations of responsibility between Far

East and MCC. For instance, the agreement required that Far East "prepare the competitive proposal, integrate the information provided by [MCC], and submit the competitive proposal to the [contracting agency]." If a contract was awarded, Far East was to "[s]upply, as salaried employees, the contract manager and quality control staff with assistance of [MCC]."

28. The agreement also made clear that, with limited exception, neither Party would "be liable to the other for any costs, expenses, risks, or liabilities arising out of the other Party's participation in the preparation, submission, or sustaining of competitive proposals under the Solicitation."

29. Far East and MCC violated central requirements of both the teaming agreement and the SBA rules and regulations. For example, on January 16, 2008, Hyun Kang, acting on behalf of MCC, entered into a profit distribution and cost reimbursement agreement with MCC. Among other things, the cost reimbursement agreement noted that MCC would reimburse Far East, the purported prime contractor on the project, for any costs that Far East incurred on the project.

30. In short, MCC, as the supposed subcontractor, bore the financial risk, not Far East, the purported prime contractor. The notion that MCC would reimburse Far East for its expenses associated with projects was a core feature of the relationship between MCC and Far East during the relevant time period. Such reimbursements, though, violated both the teaming agreement between Far East and MCC, and applicable SBA rules and regulations.

31. In addition, Far East and MCC agreed, in 2008, that MCC would be responsible for managing more of the labor required to complete the contract than would be allowed under the SBA's 8(a) and HUBZone regulations, and for paying these labor costs.

32. MCC also took steps to exercise impermissible control over Far East, and took steps to conceal from the government the extent of MCC's control over Far East.

33. For example, on January 31, 2008, MCC sought and received Far East's permission to create email addresses for MCC personnel that included Far East's name in the domain name—@fareastteam.com. When interacting with the government on behalf of Far East, some MCC employees used these misleading email addresses. These emails from some MCC employees often included signature blocks identifying themselves as Far East employees.

34. In addition, some MCC employees used letterhead bearing Far East's name when sending official correspondence to contracting agencies. And when these employees submitted task orders, bids, statements of work, invoices, and other documents on behalf of MCC, these personnel identified themselves as Far East employees.

35. For example, in early 2008, MCC submitted a task order and contract bids on behalf of Far East and falsely represented in these submissions that its employees were employees of Far East. These false submissions caused government contracting officers to believe that employees of MCC—a firm that was not 8(a) or HUBZone eligible—were employees of Far East, an 8(a) and HUBZone eligible firm.

36. Using this scheme, Far East was awarded a contract that only a HUBZone firm was eligible to receive for a multi-year construction project, Contract No. W911SE08-D-0008, on a military base in June 2008 ("Fort Jackson contract"). This multi-year project was administered through a series of task orders that required Far East to submit bids for different components of the project. MCC and Far East would ultimately generate $30 million in revenue in connection with the multi-year construction project at this military base.

**B. 2009 Addendum**

37. In July 2009, MCC and Far East negotiated, drafted, and adopted addendums to their existing profit and cost reimbursement agreement. These addendums included the following

provisions:

> 3. Upon award of each and every task order under the Contract by the Government to Far East, Far East will award a subcontract for that task order in the amount of 97% of the amount of that task order to MCC.
>
> 4. MCC will furnish all labor, equipment, material safety and supervision to perform the respective scope of work of the task order.
>
> 5. Far East will provide two employees, currently [Nominal Employee 1] and [Nominal Employee 2], and MCC will reimburse Far East for the payroll cost of those two employees upon receipt of an invoice from Allstates Technical Services, LLC. Those reimbursed amounts will be charged to the task orders as noted on the employees' time sheets.
>
> 6. Upon agreement with MCC, if Far East executes a subcontract directly with a subcontractor for a portion of the scope of work of a specific task order, then Far East will deduct that amount from its subcontract agreement with MCC however MCC will continue to be responsible for the supervision of that subcontractor unless another written agreement is executed.
>
> 7. MCC will pay all site overhead costs . . . .

38. These principles—that MCC would provide all labor, equipment, material safety, and supervision, and receive 97% of the task order amount—became the operating principles for contracts that Far East subsequently obtained and subcontracted to MCC.

39. Under this arrangement, Far East lent its name and small-business status to MCC, and MCC bore nearly all of the expenses of actually fulfilling these contracts. The agreement, by its terms, meant that Far East would be violating the requirement that it perform at least 15% of the cost of the contract, not including the costs of materials, with its own employees.

40. Moreover, the arrangement provided that, while Far East would pay the labor agency for the cost of two employees, it would be reimbursed by MCC for those expenses. In short, Far East would make it appear that it was paying and controlling employees, when, in reality, those employees were paid by MCC.

41. In addition to entering into an agreement about subcontracting labor, MCC also exercised impermissible control over the business activities of Far East, routinely bidding contracts in their names and directly submitting invoices to the government in Far East's name. For example, in May 2009, an MCC employee notified a Far East employee of a project that had been awarded to Far East. About one week later, the Far East employee asked for the documents that MCC submitted on behalf of Far East because Far East had not been provided the bid documents prior to when MCC submitted them to the contracting agency.

**C. False Claims**

42. Throughout the relevant period, Far East submitted claims for payment for four contracts that were awarded through its fraudulent scheme with MCC, including the Fort Jackson contract described above. Far East submitted claims and received payment for the following contracts during the relevant time period:

| Contract No. | Award Date | Name | First[2] Payment Date | Total Far East Revenue |
|---|---|---|---|---|
| W911SE-08-D-0008 | 6/30/2008 | Fort Jackson | 6/21/2013 | $3,156,937.61 |
| GS-04P-09-EX-D-0047 | 6/29/2009 | GSA-SC | 5/14/2013 | $80,787.00 |
| W912DQ-09-D-4015 | 12/30/2009 | Whitman AFB | 9/12/2012 | $630,035.02 |
| HSCG82-10-D-PMVA39 | 2/9/2011 | Coast Guard—South | 2/11/2013 | $219,279.70 |
| | TOTAL | | | $4,087,039.33 |

**D. Related Criminal Charges**

[2] This chart—and this complaint—includes only payments that fall within the FCA's six-year statute of limitations. 31 U.S.C. § 3731(b)(1).

43. The fraudulent scheme carried out by MCC and Far East led to several criminal charges. MCC and at least two of its officers, Walter Crummy and Thomas Harper, were charged with conspiracy to commit wire fraud in violation 18 U.S.C. §§ 371 and 1341. *United States v. MCC*, Case No. 16 CR 004 (D. D.C.); *United States v. Crummy*, Case No. 16 CR 133 (D. D.C.); *United States v. Harper*, Case No. 16 CR 095 (D. D.C.). MCC agreed to a forfeiture money judgment in the amount of $1,269,294 as a penalty for its participation in the illegal scheme

44. Michelle Cho, a Far East employee and daughter of defendants Hyun Kang and Kyong Kang, was also criminally prosecuted for conspiracy to commit wire fraud for her role in the illegal scheme. *United States v. Cho*, Case No. 16 CR 186 (D. D.C.). Cho pleaded guilty to a criminal complaint, was sentenced to six months in prison, and agreed to the entry of a forfeiture money judgement in the amount of $169,166.52.

**COUNT I**
**False Claims Act**

45. The United States incorporates herein the allegations contained in paragraphs 1 through 44 of this complaint.

46. Each defendant, including Far East, is a "person" within the meaning of the False Claims Act and, as such, is subject to liability under the Act.

47. Each of the defendants knowingly made, used or caused to be made or used, false statements or actions for the purpose of concealing the fact that an 8(a) or HUBZone firm did not participate in the performance of Contract Nos. W911SE-08-D-0008; GS04P-09-EXD-0047; W912DQ-09-D-4015; and HSCG-821-D-PMVA39, as required by the term of that contract.

48. By reason of the false claims knowingly presented or caused to be presented by defendants, the United States has incurred damages.

49. The defendants are liable, jointly and severally, under the False Claims Act for three

times the amount of the United States' damages, plus a civil penalty for each false claim.

WHEREFORE, the United States demands and prays that a judgment by entered in its favor and against defendants, jointly and severally, in the amount of triple its damages, together with the maximum civil penalties allowable by law, the costs of this action, and such other relief as may be appropriate and just.

**COUNT II**
**Unjust Enrichment**

50. The United States incorporates herein the allegations in contained paragraphs 1 through 44 of this complaint.

51. By failing to comply with the requirements set forth for 8(a)- and HUBZone-eligible firms, defendants were unjustly enriched at the expense of the United States by receiving contracts to which they were not entitled.

WHEREFORE, the United States demands and prays that a judgment be entered in its favor and against defendants for damages incurred resulting from the defendants' unjust enrichment, the costs of this action, and such other relief as may be appropriate and just.

**COUNT III**
**Mistake of Fact**

52. The United States incorporates herein the allegations contained in paragraph 1 through 44 of the complaint.

53. The defendants concealed their intentionally false and fraudulent claims from the United States.

54. The United States government would not have entered into the contract with defendants and the United States would not have made payments pursuant to the contract if the United States had known of the true nature of the claims being made upon it and of the defendants'

intent to not have complied with the requirements set forth by the SBA for 8(a)- and HUBZone-eligible firms.

55. The payments made with funds provided by the United States to defendants were made under the mistaken belief that the submissions and statements concerning the valid participation of an 8(a) and or HUBZone firm were accurate, complete and current.

WHEREFORE, the United States demands and prays that a judgment be entered in its favor and against defendants for damages incurred, the costs of this action, and such other relief as may be appropriate and just.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By: s/ Jimmy L. Arce

JIMMY L. ARCE
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-8449
jimmy.arce@usdoj.gov